FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RUSSELL ALLEN NORDYKE; ANN
SALLIE NORDYKE, dba TS Trade
Shows; JESS B. GUY; DUANE DARR;
WILLIAM J. JONES; DARYL N.
DAVID; TASIANA WESTYSCHYN; JEAN
LEE; TODD BALTES; DENNIS BLAIR,
R.L. ADAMS; ROGER BAKER; MIKE
FOURNIER; VIRGIL MCVICKER,
          *Plaintiffs-Appellants,*

       v.

MARY V. KING; GAIL STEELE;
WILMA CHAN; KEITH CARSON;
SCOTT HAGGERTY; COUNTY OF
ALAMEDA; COUNTY OF ALAMEDA
BOARD OF SUPERVISORS,
          *Defendants-Appellees.*

No. 07-15763

D.C. No.
CV-99-04389-MJJ

OPINION

Appeal from the United States District Court
for the Northern District of California
Martin J. Jenkins, District Judge, Presiding

Opinion Issued April 20, 2009
Opinion Withdrawn July 29, 2009
Reheard En Banc September 24, 2009
Remanded to Panel July 12, 2010
Re-argued and Re-submitted
October 19, 2010—San Francisco, California

Filed May 2, 2011

Before: Arthur L. Alarcón, Diarmuid F. O'Scannlain and
Ronald M. Gould, Circuit Judges.

5627

Opinion by Judge O'Scannlain;
Partial Concurrence by Judge Gould

## COUNSEL

Donald E. Kilmer, Jr., Law Offices of Donald Kilmer, San Jose, California, argued the cause for the plaintiffs-appellants and filed the brief. Don B. Kates, Battleground, Washington, was also on the brief.

Sayre Weaver, Richards, Watson & Gershon, Los Angeles, California, argued the cause for the defendants-appellees and filed the brief. Richard E. Winnie, County Counsel, Alameda County, California, T. Peter Pierce, Richards, Watson & Gershon, Los Angeles, California, and Veronica S. Gunderson, Richards Watson & Gershon, Los Angeles, California, were also on the brief.

Paul D. Clement, Jeffrey S. Bucholtz, and Adam Conrad, King & Spalding, LLP, Washington, DC, filed a brief on behalf of amicus curiae the National Rifle Association of America, Inc., in support of the plaintiffs-appellants.

Alan Gura, Gura & Possessky, PLLC, Alexandria, Virginia, filed a brief on behalf of amicus curiae the Second Amendment Foundation, Inc., in support of the defendants-appellees.

C.D. Michel, Michel & Associates, PC, Long Beach, California, Glenn S. McRoberts, Michel & Associates, PC, Long Beach, California, and Stephen P. Halbrook, Law Offices of Stephen P. Halbrook, Fairfax, Virginia, filed a brief on behalf of amicus curiae the California Rifle & Pistol Association, in support of the plaintiffs-appellants.

Herbert W. Titus, William J. Olson, John. S. Miles, and Jeremiah L. Morgan, William J. Olson, PC, Vienna, Virginia,

filed a brief on behalf of amici curiae Gun Owners of California, Inc., Gun Owners of America, Inc., and Gun Owners Foundation, in support of the plaintiffs-appellants.

Jonathan E. Lowy, Brady Center to Prevent Violence, Washington, DC, and Gil N. Peles, Proskauer Rose LLP, Los Angeles, California, filed a brief on behalf of amicus curiae Brady Center to Prevent Gun Violence, in support of the defendants-appellees.

Charles M. Dyke, Nixon Peabody LLP, San Francisco, California, filed a brief on behalf of amici curiae the Legal Community Against Violence, California Peace Officers' Association, California Police Chiefs' Association, California State Sheriffs' Association, City of Oakland, City and County of San Francisco, Violence Policy Center, and Youth Alive!, in support of the defendants-appellees.

---

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether the Second Amendment prohibits a local government from banning gun shows on its property.

I

A

Russell and Sallie Nordyke operate a business that promotes gun shows throughout California. A typical gun show involves the display and sale of thousands of firearms, generally ranging from pistols to rifles. Since 1991, the Nordykes have promoted numerous shows across the state, including one at the public fairgrounds in Alameda County. The Alameda gun shows routinely draw about 4,000 people. In the

summer of 1999, the county passed an ordinance making it a misdemeanor to bring onto or to possess a firearm or ammunition on county property. *See* Alameda Code § 9.12.120(b) ("the Ordinance"). The Ordinance does not mention gun shows.[1]

The county asserts that it passed the Ordinance in response to a shooting that occurred the previous summer at the annual county fair. The Ordinance's text reflects this, finding that "gunshot fatalities are of epidemic proportions in Alameda County." *Id.* § 9.12.120(a). The Nordykes, however, allege that the Ordinance's real purpose is to ban gun shows from county fairgrounds. To support this allegation, the Nordykes note that, shortly before proposing the Ordinance, the former county supervisor, Mary King, sent a memorandum to Richard Winnie, the county counsel, stating that King has "been trying to get rid of gun shows on County property" for "about three years," and asking Winnie to research "the most appropriate way that [King] might proceed." The memorandum also states that, in her efforts to ban gun shows, King has "gotten the run around" from "spineless people hiding behind the Constitution." At a subsequent press conference, the Nordykes assert, King again made clear that the purpose of the Ordinance was to outlaw gun shows on county property.[2]

---

[1]The Ordinance does, however, contain an exception for "[t]he possession of a firearm by an authorized participant in a motion picture, television, video, dance, or theatrical production or event . . . ." Alameda Code § 9.12.120(f)(4). This exception was apparently added in response to complaints by military reenactors, who wished to use firearms loaded with blank ammunition.

[2]At the press conference, King said that she "finds it ridiculous that the county is participating . . . in the distribution of guns" by hosting gun shows on the county fairgrounds. She found it "strange," that "a facility owned by the residents of this county" is used "to display guns for worship as deities for the collectors who treat them as icons of patriotism." She spoke of her past "efforts . . . to outlaw [gun] shows on county property," and implied that the Ordinance was the fruit of these efforts. King later referred to gun show supporters as "gun worshipers."

Whatever the intent of the Ordinance, the Nordykes assert that its effect was to ban gun shows on county property. After the county passed the Ordinance, the manager of the fairgrounds asked the Nordykes to submit a written plan explaining how their next gun show would comply with the Ordinance. Although the Ordinance did not expressly prohibit gun shows or the sale of firearms, the Nordykes insisted then and maintain now that they cannot hold a gun show without guns.[3] Rather than submitting a compliance plan, the Nordykes filed this suit.[4]

## B

Before discussing the district court rulings now before us, it is necessary to summarize this case's long and tangled procedural history. The Nordykes, joined by several would-be exhibitors or patrons at their gun shows (collectively, "the Nordykes"), first sued Alameda County, its Board of Supervisors, and a number of its employees, including King (collectively, "the County") in 1999. Initially, the Nordykes asserted just two claims: a First Amendment free speech claim, and a claim that the Ordinance was preempted by state law. In due course, they moved for a preliminary injunction forbidding the County from enforcing the Ordinance against their gun

---

[3]To support this assertion, the Nordykes note that more than half of the would-be vendors at their gun show canceled their plans to attend after the Ordinance passed. These vendors allegedly stated that they would not participate in a gun show where guns could not be displayed.

[4]Significantly, the Nordykes have made clear that the Second Amendment violation, which they and their co-plaintiffs allegedly suffered, stems wholly from the Nordykes' inability to conduct a successful gun show at the county fairgrounds. Indeed, the Proposed Second Amended Complaint notes repeatedly that "[s]imply adding gun shows . . . to the list of events exempt from the general prohibition [of possessing guns on county property] would have been sufficient to prevent this particular lawsuit from being filed." The proposed complaint never alleges that any of the plaintiffs wished to carry guns onto county property for the purpose of defending themselves while on that property.

show. After the district court denied this motion, we accepted the Nordykes' interlocutory appeal. Rather than reaching the First Amendment question, however, we certified the preemption question to the California Supreme Court. *See Nordyke v. King*, 229 F.3d 1266, 1267 (9th Cir. 2000) ("*Nordyke I*"). The California Supreme Court answered that the County Ordinance was not preempted by state law. *See Nordyke v. King*, 44 P.3d 133, 138 (Cal. 2002) ("*Nordyke II*").

After receiving that response, we returned to the Nordykes' First Amendment claim. Construing their challenge as a facial one, we rejected the argument that the Ordinance burdened the expressive conduct of gun possession. *See Nordyke v. King*, 319 F.3d 1185, 1190 (9th Cir. 2003) ("*Nordyke III*"). Our opinion noted that its rejection of the facial attack did not "foreclose a future as applied challenge to the Ordinance." *Id.* at 1190 n.3.

In *Nordyke III* we also responded to developments in the law while the certified question was pending in the California Supreme Court, by granting the Nordykes' motion to file supplemental briefing on a potential Second Amendment claim, *see id.* at 1188, and then holding that Ninth Circuit precedent precluded such claim, *see id.* at 1191-92 (citing *Hickman v. Block*, 81 F.3d 98 (9th Cir. 1996)).

On remand, the Nordykes moved for leave to amend the complaint to add claims under the Second Amendment, the Equal Protection Clause, the Due Process Clause, and the Ninth Amendment.[5] The district court allowed the addition of all claims except for the Second Amendment claim, which the district court deemed futile because *Nordyke III* had already held that a Second Amendment claim was precluded by binding circuit precedent. After two motions to dismiss, only the First Amendment and equal protection claims survived. The

---

[5]This motion, now at issue, was filed six years ago, on December 4, 2004.

district court then granted summary judgment to the County on those remaining claims. The Nordykes timely appealed.

On that appeal, the Nordykes challenged the district court's ruling that adding a Second Amendment claim would be futile, as well as the district court's grant of summary judgment on their First Amendment and equal protection claims. Before we ruled on the appeal, however, the Supreme Court decided *District of Columbia v. Heller*, 554 U.S. 570 (2008), which held that the Second Amendment protects an individual right to keep and to bear arms for self-defense. After further briefing, we affirmed on all three issues. *See Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009) ("*Nordyke IV*"). On the Second Amendment issue, we held: (1) the individual right to keep and to bear arms recognized in *Heller* is incorporated against state and local governments through the Due Process Clause of the Fourteenth Amendment; but (2) the Ordinance constituted a permissible regulation of firearms under the Second Amendment. *See id.* at 446-60. We declined to adopt an explicit standard of review for evaluating gun-control regulations.

*Nordyke IV* was subsequently vacated and reheard en banc. *See Nordyke v. King*, 575 F.3d 890 (9th Cir. 2009). But before the en banc panel issued its decision, the Supreme Court decided *McDonald v. Chicago*, 130 S. Ct. 3020 (2010), holding, as we did in *Nordyke IV*, that "the Second Amendment right to keep and bear arms" is "fundamental to our scheme of ordered liberty" and, therefore, incorporated against the states through the Due Process Clause of the Fourteenth Amendment. *Id.* at 3036. To support this holding, the Court went to great lengths to demonstrate that the right to keep and to bear arms is a "fundamental" right. *See id.* at 3037, 3041-44. *McDonald* also specifically rejected the suggestion that the Second Amendment should receive less protection than the rest of the Bill of Rights. *See id.* at 3044 ("[W]hat [respondents] must mean is that the Second Amendment should be singled out for special—and specially unfavorable—

treatment. We reject that suggestion."). *McDonald*, like *Heller* before it, did not explicitly adopt a standard of review for Second Amendment cases. *See Heller*, 554 U.S. at 629, 634.

In response, the en banc panel remanded the case to this panel "for further consideration in light of *McDonald*." *Nordyke v. King*, 611 F.3d 1015, 1015 (9th Cir. 2009) (en banc). We then ordered supplemental briefing addressing "the impact of *McDonald* on the disposition of this case," as well as "any other issue properly before this court, including the level of scrutiny that should be applied to the ordinance in question." After further oral argument, the case was resubmitted.

## II

**[1]** Because the Supreme Court has yet to articulate a standard of review in Second Amendment cases, that task falls to the courts of appeals and the district courts. It has been suggested that only regulations which substantially burden the right to keep and to bear arms should receive heightened scrutiny. *See United States v. Masciandaro*, ___ F.3d ___, 2011 WL 1053618, at *11 (4th Cir. 2011); *United States v. Chester*, 628 F.3d 673, 680-83 (4th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *Heller v. District of Columbia*, 698 F. Supp. 2d 179, 188 (D.D.C. 2010). Other courts would apply strict scrutiny to all gun-control regulations. *See United States v. Engstrum*, 609 F. Supp. 2d 1227, 1231-32 (D. Utah 2009).[6]

---

[6]We recently upheld the constitutionality of 18 U.S.C. § 924(c)(1)(A), which criminalizes the possession of a gun in furtherance of a drug crime, against a Second Amendment challenge. *See United States v. Potter*, 630 F.3d 1260 (9th Cir. 2011). But we declined to adopt a standard of review for Second Amendment analysis in that case.

A

**[2]** The Supreme Court's reasoning in *Heller* and *McDonald* suggests that heightened scrutiny does not apply unless a regulation substantially burdens the right to keep and to bear arms for self-defense. In *Heller*, the Court distinguished the blanket handgun ban there at issue from apparently permissible gun-control regulations, by examining the extent to which each law burdened the core right to armed self-defense. The Court asserted that "the inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of arms that is overwhelmingly chosen by American society for that lawful purpose." *Heller*, 554 U.S. at 628. The *Heller* Court proceeded to review several reasons why "a citizen may prefer a handgun for home defense." *Id.* at 629.[7] The Court concluded that, "whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id.* "Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban," the Court added. *Id. Heller* thus reasoned that, because handguns are extremely useful for self-defense, the District's complete handgun ban substantially burdened the core right to armed self-defense, and was therefore unconstitutional. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443, 1456-57 (2009) (noting that *Heller* struck down the handgun ban because it made "self-defense materially more difficult" and that the *Heller* Court's "analysis suggested that the severity of the burden was important"). Likewise, *Heller* determined that the District's requirement that firearms in the home be kept inoperable made "it impossible for citizens to use [firearms] for the

---

[7]The reasons the Court listed were that handguns are "easier to store in a location that is readily accessible in an emergency," they "cannot easily be redirected or wrestled away by an attacker," they are "easier to use for those without the upper-body strength to lift and aim a long gun," and they "can be pointed at a burglar with one hand while the other hand dials the police." *Heller*, 554 U.S. at 629.

core lawful purpose of self-defense and is hence unconstitutional." *Id.* at 630. It was the handgun ban's heavy burden on effective self-defense that offended the Second Amendment.

The *Heller* Court contrasted the handgun ban's substantial burden on Second Amendment rights with eighteenth-century gunpowder storage laws, which required that excess gunpowder be kept in a special container or on the top floor of the home. The Court noted that "[n]othing about those fire-safety laws undermines our analysis" because "they do not remotely burden the right of self-defense as much as an absolute ban on handguns." *Id.* at 632. Similarly, in distinguishing the handgun ban from colonial laws that imposed minor fines for unauthorized discharge of weapons, the Court asserted that "[t]hose [colonial] laws provide no support for the severe restriction in the present case." *Id.* In so reasoning, the *Heller* Court again suggested a distinction between remote and severe burdens on the right to keep and to bear arms. *See also id.* at 629 (citing a nineteenth century state supreme court case for the proposition that "[a] statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional").

Conversely, applying strict scrutiny to every gun-control regulation would be inconsistent with *Heller*'s reasoning. Under the strict scrutiny approach, a court would have to determine whether each challenged gun-control regulation is narrowly tailored to a compelling governmental interest (presumably, the interest in reducing gun crime). But *Heller* specifically renounced an approach that would base the constitutionality of gun-control regulations on judicial estimations of the extent to which each regulation is likely to reduce such crime.

Indeed, the *Heller* majority rejected Justice Breyer's proposed "interest-balancing" test that would ask "whether the

statute burdens a protected interest . . . out of proportion to the statute's salutary effects upon other important governmental interests." *Id.* at 689-90 (Breyer, J., dissenting). The problem with Justice Breyer's test was not that it would require judges to determine the burden that gun-control regulations impose on the right to keep and to bear arms; indeed, as demonstrated above, the *Heller* majority engaged in just that analysis. Rather, the majority rejected such test because it would allow judges to constrict the scope of the Second Amendment in situations where they believe the right is too dangerous. *See id.* at 634 (majority opinion) ("The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon."); *id.* ("A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all."). But applying strict scrutiny to every gun-control regulation would require courts routinely to make precisely those types of government interest assessments.

**[3]** Just as important as what *Heller* said about a government-interest approach is what *Heller* did not say. Nowhere did it suggest that some regulations might be permissible based on the extent to which the regulation furthered the government's interest in preventing crime. Instead, *Heller* sorted such regulations based on the burden they imposed on the right to keep and to bear arms for self-defense.

B

We are satisfied that a substantial burden framework will prove to be far more judicially manageable than an approach that would reflexively apply strict scrutiny to all gun-control laws. As *McDonald* recognized, "assess[ing] the costs and benefits of firearms restrictions" requires "difficult empirical judgments in an area in which [judges] lack expertise." 130 S. Ct. at 3050. Indeed, whether a gun-control regulation serves the government's interest in safety is likely to be a dif-

ficult question to answer. *See Heller*, 554 U.S. at 702 (Breyer, J., dissenting) ("[E]mpirically based arguments . . . cannot prove either that handgun possession diminishes crime or that handgun bans are ineffective."); Volokh, *supra*, at 1461 (arguing that it "is likely to be especially hard" to "estimate the effectiveness of [a gun-control] law in preventing future crime and injury").

Applying strict scrutiny to every gun regulation would require courts to assess the effectiveness of a myriad of gun-control laws. Whenever a law is challenged under the Second Amendment, the government is likely to claim that the law serves its interest in reducing crime. *See, e.g.*, Defs.' Br. at 19 (asserting that the Ordinance serves the County's interest in "minimiz[ing] the risk of shootings"). Because the Supreme Court has already held that "the Government's general interest in preventing crime" is "compelling," *United States v. Salerno*, 481 U.S. 739, 754 (1987), the question, under strict scrutiny, would be whether the regulation is narrowly tailored to that interest. But courts cannot determine whether a gun-control regulation is narrowly tailored to the prevention of crime without deciding whether the regulation is *likely to be effective* (or, at least, whether less burdensome regulations would be as effective). Sorting gun-control regulations based on their likely effectiveness is a task better fit for the legislature. *Cf.* Richard H. Fallon, Jr., *Judicially Manageable Standards and Constitutional Meaning*, 119 Harv. L. Rev. 1274, 1291 (2006) ("A test may be deemed judicially unmanageable if it would require courts to make empirical findings or predictive judgments for which they lack competence.").

By contrast, the substantial burden test, though hardly mechanical, will not produce nearly as many difficult empirical questions as strict scrutiny. *See* Volokh, *supra*, at 1459-60 (arguing that it is easier to determine whether a law substantially burdens the right to bear arms than to figure out whether a law "will reduce the danger of gun crime"). Indeed, courts make similar determinations in other constitutional contexts.

*See, e.g.*, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992) (holding that pre-viability abortion regulations are unconstitutional if they impose an "undue burden" on a women's right to terminate her pregnancy); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (stating that content-neutral speech regulations are unconstitutional if they do not "leave open ample alternative channels for communication"). Courts can use the doctrines generated in these related contexts for guidance in determining whether a gun-control regulation is impermissibly burdensome, as we suggest below.

C

In their supplemental briefs, the Nordykes and their amici argue that *McDonald* requires this Court to give strict scrutiny to the Ordinance. This is so, the briefs assert, because *McDonald* held that the right to keep and to bear arms is "fundamental." For support, the briefs point to a number of cases noting that laws burdening fundamental rights trigger strict scrutiny. *See, e.g.*, *Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("[C]lassifications affecting fundamental rights . . . are given the most exacting scrutiny.").

But, the Supreme Court does not apply strict scrutiny to every law that regulates the exercise of a fundamental right, despite language in some cases suggesting the contrary. Instead, in a variety of contexts, the Court applies mere rational basis scrutiny to laws that regulate, but do not significantly burden, fundamental rights. *Cf. Casey*, 505 U.S. at 873 ("Not every law which makes a right more difficult to exercise is, ipso facto, an infringement of that right.").

For instance, even though the Supreme Court has recognized a constitutional right to obtain an abortion,[8] it has

---

[8]Admittedly, there is some dispute over whether the right to obtain an abortion still enjoys "fundamental" status. *See Lawrence v. Texas*, 539

approved a number of regulations that had the "effect of increasing the cost or decreasing the availability" of abortions. *Id.* at 874. These regulations command mere rational basis review so long as they do not pose an "undue burden" on the right to abort a non-viable fetus. *See Gonzales v. Carhart*, 550 U.S. 124, 146 (2007). Similarly, "the government may impose reasonable restrictions on the time, place, or manner of protected speech," provided, inter alia, that the restrictions are not too cumbersome. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

And the Court has rejected the proposition that "a law that imposes any burden upon the right to vote [or to associate with others for political purposes] must be subject to strict scrutiny." *Burdick v. Takushi*, 504 U.S. 428, 432 (1992). Thus, rather than strictly scrutinizing every law which burdens these rights, the Supreme Court has held that "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.* at 434. Election laws trigger strict scrutiny only where the rights to vote and to associate "are subjected to 'severe' restrictions." *Id.* (internal quotation marks and citations omitted); *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451-52 (2008). Indeed, even though "the right to marry is of fundamental importance," regulations of that right do not trigger strict scrutiny unless they "significantly interfere[ ] with [its] exercise." *Zablocki v. Redhail*, 434 U.S. 374, 383 (1978).

---

U.S. 558, 589-95 (2003) (Scalia, J., dissenting) (arguing that *Roe*'s statement that abortion is a "fundamental right" has been undermined by subsequent cases holding that only rights that are " 'deeply rooted in this Nation's history and tradition' " are "fundamental" (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997))). *Compare Roe v. Wade*, 410 U.S. 113, 155 (1973) (deeming the right to an abortion "fundamental"), *with Casey*, 505 U.S. at 843-912 (not once describing abortion as a "fundamental right" or a "fundamental liberty interest"). We express no opinion on this issue.

**[4]** Accordingly, we hold that only regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment.[9]

### III

**[5]** Having determined the standard of review, the question becomes whether the Nordykes' Proposed Second Amended Complaint sufficiently alleged that the Ordinance substantially burdens their right to keep and to bear arms. The Nordykes only challenge the ordinance as an effective prohibition of gun shows on county fairgrounds. That is, they complain that they cannot display and sell guns on county property; they do not allege that they wish to carry guns on county property for the purpose of defending themselves while on that property.[10] Thus, the proper inquiry is whether a ban on gun shows at the county fairgrounds substantially burdens the right to keep and to bear arms; not whether a county can ban all people from carrying firearms on all of its property for any purpose. *See Carhart*, 550 U.S. at 168 ("It is neither our obligation nor within our traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop.").[11]

---

[9]We need not decide today precisely what type of heightened scrutiny applies to laws that substantially burden Second Amendment rights.

[10]Indeed, the Proposed Second Amended Complaint repeatedly notes that simply excepting gun shows from the ban on possessing guns on county property "would have been sufficient to prevent this particular lawsuit from being filed."

[11]Even if the Court construes the claim as a facial challenge—an interpretation which the proposed complaint does not support— such a challenge would clearly fail because the Nordykes have not alleged that the Ordinance "would be unconstitutional in a large fraction of relevant cases," *Carhart*, 550 U.S. at 124, let alone that it would be unconstitutional in all cases, *see Ohio v. Akron Ctr. for Reproductive Health*, 497 U.S. 502, 514 (1990) ("[B]ecause appellees are making a facial challenge to a statute, they must show that no set of circumstances exists under which the Act would be valid" (internal quotation marks omitted)); *United*

A

Where, as here, government restricts the distribution of a constitutionally protected good or service, courts typically ask whether the restriction leaves open sufficient alternative avenues for obtaining the good or service. For instance, courts reviewing a restriction on the time, place, or manner of protected speech will ask whether the restriction "leave[s] open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791. Thus, the Supreme Court upheld an ordinance that prohibited "picketing before or about the residence . . . of any individual" because protestors were not barred from residential neighborhoods generally, but rather could "enter such neighborhoods, alone or in groups, even marching," go "door-to-door to proselytize their views," "distribute literature," and "contact residents by telephone." *Frisby v. Schultz*, 487 U.S. 474, 477, 483-84 (1988).

Likewise, the Supreme Court recently held that a ban on one particular method of performing an abortion did not constitute an "undue burden" on the right to an abortion in part because "[a]lternatives [were] available to the prohibited procedure." *Carhart*, 550 U.S. at 164; *see also id.* at 165 ("[T]he Act allows . . . a commonly used and generally accepted [abortion] method, so it does not construct a substantial obstacle to the abortion right.").

**[6]** Following this lead, when deciding whether a restriction on gun sales substantially burdens Second Amendment rights, we should ask whether the restriction leaves law-abiding citizens with reasonable alternative means for obtain-

States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). Instead, the Nordykes only discuss one application of the Ordinance—to gun shows on fairgrounds.

ing firearms sufficient for self-defense purposes. *See United States v. Marzzarella*, 595 F. Supp. 2d 596, 606 (W.D. Pa. 2009) (suggesting that a ban on guns with obliterated serial numbers should be judged under a standard comparable to that "applicable to content-neutral time, place and manner restrictions," and upholding the ban partly because it leaves "open ample opportunity for law-abiding citizens to own and possess guns"), *aff'd*, 614 F.3d 85, 95 (3d Cir. 2010).

Similarly, a law does not substantially burden a constitutional right simply because it makes the right more expensive or more difficult to exercise. *See Carhart*, 550 U.S. at 157-58 (" 'The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it.' " (quoting *Casey*, 505 U.S. at 874)); *Zablocki*, 434 U.S. at 387 n.12 (noting that a law reducing the federal benefits of a couple by twenty dollars on account of their marriage did not "substantial[ly] . . . interfere[ ] with the freedom to marry," because it was unlikely to "significantly discourage[ ]" any marriage). Thus, regulations of gun sales do not substantially burden Second Amendment rights merely because they make it more difficult to obtain a gun. *Cf. Heller*, 554 U.S. at 626-27 ("[N]othing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms.").

Finally, a regulation is particularly unlikely to impose a substantial burden on a constitutional right where it simply declines to use government funds or property to facilitate the exercise of that right. For instance, the Supreme Court held that excluding even medically necessary abortions from Medicaid coverage did not constitute an "unduly burdensome interference with [a pregnant women's] freedom to decide whether to terminate her pregnancy." *Harris v. McRae*, 448 U.S. 297, 313 (1980). Regulations that simply refuse to provide government subsidies to gun dealers, therefore, do not

constitute a substantial burden on the right to keep and to bear arms.

B

**[7]** Applying the foregoing considerations, we must determine whether the Proposed Second Amended Complaint alleged sufficient facts to suggest plausibly that the Ordinance substantially burdens the Nordykes' right to keep and to bear arms.[12] It does not assert that the Ordinance makes it materially more difficult to obtain firearms. Nor does it allege a shortage of places to purchase guns in or near Alameda County. In any event, the Ordinance does not prohibit gun shows, but merely declines to host them on government premises. The Proposed Second Amended Complaint, therefore, does not allege sufficient facts to state a Second Amendment claim capable of surviving a motion to dismiss. Accordingly, we conclude that the district court properly denied the Nordykes' motion for leave to amend to that extent.

Nevertheless, the district court did not state whether its denial of leave to amend was with prejudice, which it presumably was since it unequivocally stated that "Plaintiffs lack[ ] standing to assert a Second Amendment violation." A denial of leave to amend for futility should be with prejudice whenever a dismissal of the proposed complaint would have been

---

[12]Under Federal Rule of Civil Procedure 15(a), leave to amend should be given freely, but need not be granted when the proposed amendment is futile. *See Universal Mortgage Co. v. Prudential Ins. Co.*, 799 F.2d 458, 459 (9th Cir. 1986). A proposed amended complaint is futile if it would be immediately "subject to dismissal." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998). Thus, the "proper test to be applied when determining the legal sufficiency of a proposed amendment is identical to the one used when considering the sufficiency of a pleading challenged under Rule 12(b)(6)." *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). In evaluating whether the district court should have granted the Nordykes' motion for leave to amend, therefore, we look only to facts pled in the Proposed Second Amended Complaint. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009).

with prejudice, *Miller*, 845 F.2d at 214, that is, if the proposed complaint "could not be saved by amendment," *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

But the Nordykes submitted the Proposed Second Amended Complaint over six years ago. Since then, all of the Supreme Court's modern Second Amendment case law has been created. *See McDonald v. Chicago*, 130 S. Ct. 3020 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *cf. Nordyke IV*, 563 F.3d at 459 ("Second Amendment law remains in its infancy.").[13] Accordingly, there may well be facts which the Nordykes did not consider relevant in 2004, and thus did not allege in the Proposed Second Amended Complaint, but which, if now alleged, might plausibly suggest that the Ordinance substantially burdens the Nordykes' Second Amendment rights.

**[8]** Therefore, to the extent that the district court's denial of leave to amend was with prejudice, it must be vacated and the Nordykes given the opportunity further to amend their complaint. If they do, the district court should consider, in light of *Heller*, *McDonald*, and this opinion, whether the Nordykes have alleged a viable Second Amendment claim.

IV

Judge Gould respectfully disagrees with the substantial burden framework that we adopt today. Instead, he would "subject to heightened scrutiny only arms regulations falling within the core purposes of the Second Amendment." Concur. at 5659. All other gun-control regulations would trigger only

---

[13]Before *Heller*, the Court last considered the meaning of the Second Amendment in *United States v. Miller*, 307 U.S. 174 (1939). For years, several courts, including our own, read *Miller* to hold that the Second Amendment does not afford individuals the right to keep and to bear arms for self-defense. *See, e.g.*, *Hickman*, 81 F.3d at 101.

"reasonableness review." *Id.* Depending on how one reads Judge Gould's framework, we suggest that it is either equivalent to the approach we adopt today, or inconsistent with the Supreme Court's decisions in *Heller* and *McDonald*.

On one reading, Judge Gould's approach is roughly the same as our own. After all, it is not initially clear how determining whether a regulation "substantially burdens the right to keep and to bear arms" is different from determining whether the regulation "fall[s] within the core purposes of the Second Amendment." Both approaches would require a court to determine the extent to which a regulation interferes with the right to keep and to bear arms, and both would apply heightened scrutiny only to regulations whose interference with the right reaches a certain threshold.

Judge Gould seems to think his "core purposes" test does not require any such degree-of-burden analysis. For instance, he insists that "[l]aws banning handguns are constitutionally suspect not because they 'burden' the Second Amendment right, but because they proscribe the very activity that the Second Amendment protects—armed defense of the home." Concur. at 5662. But a handgun ban does not "proscribe" armed self-defense; it just makes it far more difficult. Thus, in *Heller*, the District of Columbia asserted that "it is permissible to ban the possession of handguns so long as the possession of other firearms ( i.e., long guns) is allowed." 554 U.S. at 629. In order to reject this argument, the *Heller* majority had to establish that handguns are extremely useful for self-defense and, therefore, that the handgun ban seriously undermined the right to armed self-defense. *Id.* Given the infinite variety of conceivable gun-control regulations, we suspect that applying Judge Gould's test would require a similar degree-of-burden assessment in order to determine which regulations conflict with the "core purposes" of the Second Amendment and which do not.

Judge Gould's framework could also be read as applying mere rational basis scrutiny to every gun-control regulation

that is not a complete ban on handguns. This reading is suggested by Judge Gould's statements that "*reasonableness* should be our guide in the Second Amendment context," Concur. at 5660-61, and that he "would be deferential to a legislature's reasonable regulations unless they specifically restrict defense of the home, resistance of tyrannous government, or protection of country," *id.* at 5663. But the Supreme Court has rejected an approach that would enforce the Second Amendment wholly, or primarily, through rational basis review. *See Heller*, 554 U.S. at 629 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."); *cf. McDonald*, 130 S. Ct. at 3044 (refusing to treat the Second Amendment as a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees").

Appearing to defend this second reading of his approach, Judge Gould asserts that "[i]n the First Amendment context, we do not hold time, place, and manner speech restrictions to be constitutionally suspect when they substantially burden speech." Concur. at 5662. But, even content-neutral time, place, and manner restrictions are suspect if they fail to "leave open ample alternative channels for communication." *Ward*, 491 U.S. at 791. That is just another way of saying that such regulations cannot be too "restrictive," *id.* at 802, or, too burdensome. Accordingly, the Court has struck down content-neutral, time, place, and manner restrictions that are so broad as to burden substantially one's freedom of speech. *See Martin v. Struthers*, 319 U.S. 141 (1943) (striking down an ordinance banning door-to-door solicitation); *Schneider v. New Jersey*, 308 U.S. 147, 162-63 (1939) (striking down an ordinance prohibiting the distribution of handbills).

Drawing from these cases, we have directed lower courts, when deciding whether a restriction on gun sales substantially burdens Second Amendment rights, to ask whether the restric-

tion leaves law-abiding citizens with reasonable alternative means for obtaining firearms sufficient for self-defense purposes. *See supra* Part III.A. By contrast, Judge Gould would apparently apply rational basis review to every gun sales regulation, even if it made guns nearly impossible to obtain. This is alarming since almost every gun-control regulation—even those amounting to de facto gun bans—is rationally related to the government's legitimate interest in reducing gun crime. *See Heller*, 554 U.S. at 629 n.27 ("[T]his law, like almost all laws, would pass rational-basis scrutiny."). The Supreme Court was not exaggerating when it insisted that a Second Amendment backed only by rational basis review would have "no effect." *Heller*, 554 U.S. at 629 n.27.[14]

Finally, Judge Gould asserts that there is a difference between "rational basis review" and "reasonableness review,"

---

[14]*Heller* made clear that the right it recognized is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," asserting that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places, such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626. In a footnote, the Court stated that "we identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26.

Judge Gould focuses on the footnote's reference to "presumptively lawful regulations," reading it to mean "regulations that will command only rationality review." Concur. at 5661. We believe it most unlikely that, in a one-sentence footnote, the Supreme Court would undermine the rest of its analysis by declaring, inter alia, that all gun sales regulations, no matter how burdensome, should receive the rubber stamp of rational basis review. Instead, we read "presumptively lawful regulations" to mean "regulations which we presume will survive constitutional scrutiny," and to say nothing about what standard of review should be applied to them. This reading fits with the context in which the remark was made: cautioning readers against overreading the opinion. As Judge Easterbrook put it, this section of *Heller* is merely "precautionary language" that "warns readers not to treat *Heller* as containing broader holdings than the Court set out to establish." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010).

in that the latter " 'focuses on the balance of the interests at stake, rather than merely on whether any conceivable rationale exists.' " Concur. at 5663-64 (quoting *State v. Cole*, 665 N.W.2d 328, 338 (Wis. 2003)). This interest-balancing test sounds exactly like Justice Breyer's "interest-balancing" test that would ask "whether the statute burdens a protected interest . . . out of proportion to the statute's salutary effects upon other important governmental interests." *Heller*, 554 U.S. 689-90 (Breyer, J., dissenting). We believe the Supreme Court has rejected such an approach in no uncertain terms. *See id.* at 634-35; *McDonald*, 130 S. Ct. at 3047 ("In *Heller* . . . we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing.").

V

The Nordykes also appeal from the district court's grant of summary judgment on their First Amendment claim.

**[9]** We have already laid out the template for analyzing the Nordykes' First Amendment claim, albeit in the context of a facial challenge:

> In evaluating the Nordykes claim, we must ask whether "[a]n intent to convey a particularized message [is] present, and [whether] the likelihood [is] great that the message would be understood by those who viewed it." *Spence v. Washington*, 418 U.S. 405, 410-11 (1974). If the possession of firearms is expressive conduct, the question becomes whether the County's "regulation is related to the suppression of free expression." *Texas v. Johnson*, 491 U.S. 397, 403 (1989). If so, strict scrutiny applies. If not, we must apply the less stringent standard announced in *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

*Nordyke III*, 319 F.3d at 1189. Because the County "does not contest that gun possession in the context of a gun show may

involve certain elements of protected speech," we assume, without deciding, that the display of guns at a gun show is expressive conduct under *Spence*.

## A

The next question is whether to apply strict scrutiny to the Ordinance under *Johnson* or "the less stringent standard" of *O'Brien*. The level of scrutiny depends on whether the Ordinance is "related to the suppression of free expression." *Johnson*, 491 U.S. at 407 (internal quotation marks and citation omitted). That is, the government may not "proscribe particular conduct *because* it has expressive elements." *Id.* at 406. If a law hits speech because it aimed at it, then courts apply strict scrutiny; but if it hits speech without having aimed at it, then courts apply the *O'Brien* intermediate scrutiny standard. *See id.* at 407 ("[T]he governmental interest in question [must] be unconnected to expression in order to come under *O'Brien*'s less demanding rule.").

The Nordykes argue that the County adopted the Ordinance in order to prevent members of the "gun culture" from expressing their views about firearms and the Second Amendment. However, the Ordinance's language suggests that gun violence, not gun culture, motivated its passage. Section 9.12.120(a) recites several statistics about gunshot deaths and injuries in Alameda County and then concludes that "[p]rohibiting the possession of firearms on County property will promote the public health and safety by contributing to the reduction of gunshot fatalities and injuries in the County." *Id.* Nevertheless, the Nordykes point to alternative evidence of the Ordinance's purpose: the comments of Supervisor King and the section 9.12.120(f)(4) exception for authorized firearm use at certain artistic events.

King's private and public remarks, quoted above, could be read to suggest that she harbored a motive to exclude people of a certain view on gun use from the fairgrounds. But the

feelings of one county official do not necessarily bear any relation to the aims and interests of the county legislature as a whole. Indeed, the *O'Brien* Court admonished litigants against attributing the motivations of legislators to legislatures:

> What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it.

391 U.S. at 384.

In *Johnson*, too, the Court determined whether the law at issue was related to the suppression of speech without psychoanalyzing its authors. The opinion did not mention legislative history or the stated motives of any legislator. Instead, it analyzed the statute in terms of the interests the state declared, not the personal likes or dislikes of the law's backers. Other First Amendment cases are of a piece. *See, e.g.*, *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986) ("The ordinance *by its terms* is designed to prevent crime, protect the city's retail trade, maintain property values, and generally protect and preserve the quality of the city's neighborhoods, commercial districts, and the quality of urban life, not to suppress the expression of unpopular views." (emphasis added) (internal quotation marks and alterations omitted)).

This approach is particularly appropriate here, because the County has offered a plausible purpose for the Ordinance: the reduction of gun violence on county property. The Ordinance itself proclaims that purpose; even Supervisor King expressed it during her press conference.

Undeterred, the Nordykes insist that the Ordinance's exception for certain artistic productions or events reveals its constitutionally suspect motives. They cry foul because the Ordinance effectively bans gun shows at the fairgrounds, while going out of its way to accommodate gun-bearing military reenactors. But statutes frequently have exceptions; the exceptions only suggest unconstitutional favoritism if what they allow generates problems that are so similar to what they prohibit as to admit of no other rational explanation. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 510-12 (1981) (plurality opinion). It is not difficult to see how 4000 shoppers trading in modern firearms is sufficiently distinct from a crowd of history buffs dressed in traditional garb playing with blank ammunition.

**[10]** Accordingly, we reject the Nordykes' invitation to apply strict scrutiny because we conclude that the Ordinance is "unrelated to the suppression of free expression." *Johnson*, 491 U.S. at 407 (internal quotation marks and citation omitted). Instead, *O'Brien*'s intermediate scrutiny standard applies.

B

"[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *O'Brien*, 391 U.S. at 376. More specifically, "a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377.

Because the Nordykes no longer argue that the County lacks the power to regulate firearms possession on county

property, *see Nordyke II*, 44 P.3d 133 (stating that the Ordinance is not preempted by state law), we need not address the first prong.

**[11]** The second prong requires us to evaluate whether the Ordinance furthers the County's interest in promoting safety and discouraging violence. The Nordykes argue that, given their as-applied challenge, the Ordinance is unconstitutional because the County cannot show that any violence ever occurred at their gun shows. But, even for an as-applied challenge, the government need not show that the litigant himself actually contributes to the problem that motivated the law he challenges. *See, e.g.*, *Clark*, 468 U.S. at 296-97 ("[T]he validity of this regulation need not be judged solely by reference to the demonstration at hand."); *One World One Family Now v. City & Cnty. of Honolulu*, 76 F.3d 1009, 1013 n.6 (9th Cir. 1996) (noting, in the context of an as-applied challenge, that the government need not "offer any concrete evidence demonstrating that [the plaintiff's activities] actually" caused the harm the government sought to prevent). Rather, it is enough that the regulation generally "furthers an important or substantial governmental interest." *O'Brien*, 391 U.S. at 376. Here, there is sufficient evidence to suggest that the Ordinance furthers the County's interest in keeping those on its property safe from gun crime.

**[12]** The third prong of the *O'Brien* test simply repeats the threshold inquiry of whether the statute is unrelated to the suppression of free expression, which we addressed above. Which leaves the fourth and final prong: whether the restriction on free expression is greater than necessary to further the government's interest. The Nordykes assert that there are less restrictive ways the County could reduce gun violence, such as by using metal detectors. But metal detectors would not reduce gun violence on county property unless county officials could confiscate the guns that those devices discover. And county officials could not confiscate the guns which the metal detectors discover unless it were illegal to posses fire-

arms on county property. The County thought it dangerous for people to possess firearms on its property. Banning or strictly regulating gun possession on county land is a straightforward response to such a danger.

[13] We conclude that the Ordinance passes the *O'Brien* test as applied to the Nordykes' gun shows. The district court properly granted summary judgment to the County on this claim.

## VI

The Nordykes' final claim alleges a violation of the Equal Protection Clause. This claim revolves around their suspicion that the exception in the Ordinance for certain artistic events, Alameda Code § 9.12.120(f)(4), was designed to favor military reenactors over gun show participants, an alleged favoritism resting on the County's disdain for the "gun culture."

[14] Where, as here, an ordinance does not "purposefully operate[ ] to the detriment of a suspect class, the only requirement of equal protection is that [the ordinance] be rationally related to a legitimate governmental interest." *Harris*, 448 U.S. at 326; *see also Romer v. Evans*, 517 U.S. 620, 631 (1996) (stating that, because "most legislation classifies for one purpose or another, with resulting disadvantage to various groups," the Court will uphold a legislative classification so long as it "neither burdens a fundamental right nor targets a suspect class," and "bears a rational relation to some legitimate end"). Here, the burdened class—be it "gun-owners," or "gun-show promoters and participants"—is not suspect. *See Olympic Arms v. Buckles*, 301 F.3d 384, 388-89 (6th Cir. 2002). And, although the right to keep and to bear arms for self-defense is a fundamental right, *McDonald*, 130 S. Ct. at 3036-43, that right is more appropriately analyzed under the Second Amendment. *Cf. Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular

sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.' " (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989))).

**[15]** Therefore, the Nordykes' equal protection claim will fail so long as the Ordinance's distinction between military reenactments and gun shows is rational. *See Romer*, 517 U.S. at 631. The County could reasonably conclude that gun shows are more dangerous than military reenactments. This is enough to satisfy rational basis scrutiny. *See Williamson v. Lee Optical*, 348 U.S. 483, 489 (1955) ("Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think.").

**[16]** Accordingly, the district court correctly awarded the County summary judgment on the equal protection claim.

## VII

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment to the County on the Nordykes' First Amendment and equal protection claims. Because the Nordykes may still be able to allege sufficient facts to state a Second Amendment claim, we VACATE the district court's denial of leave to amend the complaint to the extent that the denial was with prejudice, and REMAND for further proceedings.

Each party shall bear its own costs.

**AFFIRMED in part, VACATED in part, and REMANDED.**

GOULD, Circuit Judge, concurring in part and in the judgment:

I concur in the majority opinion to the extent that it affirms the dismissal of the plaintiffs' complaint and remands to allow amendment of pleadings, giving plaintiffs an opportunity to seek to assert an actionable claim in light of recent developments in Second Amendment law. However, I would use a test to decide Second Amendment claims different from that set out by the majority. Drawing from First Amendment doctrine, I would subject to heightened scrutiny only arms regulations falling within the core purposes of the Second Amendment, that is, regulations aimed at restricting defense of the home, resistance of tyrannous government, and protection of country; I would subject incidental burdens on the Second Amendment right (analogous to time, place, and manner speech restrictions[1]) to reasonableness review. *Cf. Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1132 (2009) ("Reasonable time, place, and manner restrictions are allowed, but any restriction based on the content of the speech must satisfy strict scrutiny . . . ." (citations omitted)).[2]

---

[1]Time, place, and manner restrictions, while sometimes said to be subject to intermediate scrutiny, are normally upheld when reasonable. *See Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 480 (1989) ("What our decisions require is a 'fit' between the legislature's ends and the means chosen to accomplish those ends . . . . Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed." (internal quotation marks and citations omitted)); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986) ("[T]ime, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication."); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 313-15 (1984) (Marshall, J., dissenting) ("[R]egulations that are aimed at matters other than expression receive only a minimal level of scrutiny . . . [and it is assumed] that the balance struck by officials is deserving of deference so long as it does not appear to be tainted by content discrimination.").

[2]*See Parker v. District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007) ("The protections of the Second Amendment are subject to the same sort of reasonable restrictions that have been recognized as limiting, for instance, the First Amendment."), *aff'd, District of Columbia v. Heller*, 554 U.S. 570 (2008).

## I

When we first heard this case eight years ago, before the Supreme Court provided for an individual Second Amendment right in *District of Columbia v. Heller*, 554 U.S. 570 (2008), I urged that "[w]e should recognize that individual citizens have a right to keep and bear arms, subject to reasonable restriction by the government." *Nordyke v. King*, 319 F.3d 1185, 1193 (9th Cir. 2003) (Gould, J., concurring). My special concurrence foreshadowed the issue before us today:

> [T]hough recognizing an individual right to keep and bear arms, government can within due bounds regulate ownership or use of weapons for the public good. We would make progress if the Supreme Court were to establish a doctrine of an individual Second Amendment right subject to reasonable government regulation. The decisional chips would thereafter fall where they may on the basis of particular cases and the delicate balance of their precise facts, aided by the complementary efforts of lawyers, scholars and judges. The law would best put aside extreme positions and adopt an assessment of reasonableness of gun regulation, for this would place us on the right track.

*Id.* at 1197. I cited in support of my view the position of the United States as stated in a brief opposing certiorari and in a memorandum from then-Attorney General John Ashcroft, both of which said that the Second Amendment protects an individual right with "reasonable [arms] restrictions" permitted.[3] *See id.* at 1193 nn.1-2. My view continues to be that *rea-*

---

[3]One commentator observed of the Ashcroft memorandum, "After setting forth the administration's support for the individual-rights reading, [it] stated that '[t]he Department [of Justice] can and will continue to defend vigorously the constitutionality, under the Second Amendment, of all existing federal firearms laws.' In other words, in the Department's view, every single federal law burdening the right to bear arms remains constitutional . . . ." Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 691-92 (2007).

*sonableness* should be our guide in the Second Amendment context.

This view finds support in the controlling Supreme Court opinions. *Heller* identifies a number of "presumptively lawful regulatory measures," 554 U.S. at 627 n.26, such as "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27.[4] Despite this guidance, the majority would subject at least some of these "presumptively lawful" arms restrictions to a level of scrutiny that by definition presumes them unlawful. *See* 1 Rodney A. Smolla & Melville B. Nimmer, *Freedom of Speech* § 4:3 (2010) ("When some form of heightened scrutiny is applied, the law may properly be regarded as '*presumptively*' *invalid*, and likely to be struck down." (emphasis added)); *see also Emp't Div., Dept. of Human Res. v. Smith*, 494 U.S. 872, 888 (1990) (explaining that heightened scrutiny deems laws "*presumptively invalid*"). Given the Supreme Court's admonition that certain arms restrictions are presumptively lawful, "a heightened standard that presumes every regulation to be unconstitutional makes no sense." Winkler, *supra*, at 708. To take one example, the majority erects a high hurdle for felon dispossession laws to surmount.[5] I would not read *Heller* to require such rigorous review.

---

[4]We are bound by the Supreme Court's instruction that these sorts of regulations are "presumptively lawful," and have rejected the suggestion that the instruction is mere dictum. *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010); *see also United States v. Barton*, 633 F.3d 168, 171 (3d Cir. 2011).

[5]*See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 730 (2009) ("[A]bsent conviction for some 'crime of violence,' . . . it is difficult to see how the Second Amendment could allow a convict to be disabled from keeping or bearing arms."); Andrew R. Gould, *The Hidden Second Amendment Framework Within District of Columbia v. Heller*, 62 Vand. L. Rev. 1535, 1567 (2009) ("If the *Heller* Court had truly subjected this list of 'presumptively lawful regulatory measures' to conventional strict scrutiny, it is doubtful that any of the regulations would be upheld.").

The majority, I think incorrectly, reads *Heller* as "sort[ing] [arms] regulations based on the burden they impose[ ] on the right to keep and to bear arms for self-defense." Maj. op. at 5640. *Heller* nowhere assesses the extent of a handgun ban's "burden" on the Second Amendment right. Rather, *Heller* holds that a law barring home-possession of handguns is categorically impermissible because it targets " 'the most preferred firearm in the nation to 'keep' and use for protection of one's home and family,' " 554 U.S. at 628-29 (quoting *Parker*, 478 F.3d at 400), and "makes it impossible for citizens to use [arms] for the core lawful purpose of self-defense," *id.* at 630. Laws banning handguns are constitutionally suspect not because they "burden" the Second Amendment right, but because they proscribe the very activity that the Second Amendment protects—armed defense of the home, a right that millions of Americans rightly and wisely respect.[6]

In the First Amendment context, we do not hold time, place, and manner speech restrictions to be constitutionally suspect when they substantially burden speech. Strict scrutiny and presumed invalidity is triggered when a regulation restricts the content of speech, not by the extent of a regulation's incidental burden. *See Clark*, 486 U.S. at 293-99;

---

[6]*Heller*'s statement that the Second Amendment protects only weapons "in common use" further belies the majority's "substantial burden" review. To be sure, laws barring possession of military-grade weapons might be argued to substantially burden the right to have weapons. Indeed, these laws completely foreclose the use of arms designed for large-scale military purposes. Nonetheless, these laws in my view are indisputably permissible because they do not tread on the Second Amendment's core purposes and are reasonable. I do not mean to be facetious, but to me it is obvious that the Second Amendment does not protect the right to keep a nuclear weapon in one's basement, or a chemical or biological weapons in one's attic, or a tank in one's backyard. Either such weapons do not constitute "arms" within the meaning of the Second Amendment, or regulation must nonetheless be sustained to protect society's interest. In any event, such weapons are not "in common use" within the meaning of *Heller*.

*Frisby v. Schultz*, 487 U.S. 474, 481-88 (1988). Similarly in the Second Amendment context, I would be deferential to a legislature's reasonable regulations unless they specifically restrict defense of the home, resistance of tyrannous government, or protection of country.[7]

## II

Some scholars and judges have argued that reviewing arms restrictions for reasonableness is too deferential to legislative determinations. Some have proposed complex doctrines to aid the sorting of gun control laws into categories of constitutional and unconstitutional. These approaches suffer from the error of "view[ing] the Second Amendment exclusively or primarily with the issue in mind of whether it constrains gun control." *Nordyke*, 319 F.3d at 1197 n.11 (Gould, J., specially concurring). The Framers of our Constitution and its Bill of Rights did not have in mind modern-day guns and corollary regulations, and we should not craft our judicial doctrine from the premise that the Second Amendment necessarily proscribes existing restrictions.

The majority opinion criticizes reasonableness review for "applying mere rational basis scrutiny to every gun-control regulation that is not a complete ban on handguns." Maj. op. at 5649-50. But this conflates reasonableness review with rational basis review. "[T]he reasonableness test focuses on

---

[7]An example of an arms regulation that specifically restricts resistance of tyrannous government is a law barring only members of a disfavored or dissident group from gun ownership. This sort of regulation is a familiar way that autocrats have seized and centralized power. *See* David C. Williams, *Constitutional Tales of Violence: Populists, Outgroups, and the Multicultural Landscape of the Second Amendment*, 74 Tul. L. Rev. 387, 417 n.172 (1999) (collecting historical examples); *see also Silveira v. Lockyer*, 328 F.3d 567, 569 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc) ("Disarmament was the tool of choice for subjugating both slaves and free blacks in the South. . . . [T]he institution of slavery required a class of people who lacked the means to resist.").

the balance of the interests at stake, rather than merely on whether any conceivable rationale exists under which the legislature may have concluded the law could promote the public welfare." *State v. Cole*, 665 N.W.2d 328, 338 (Wis. 2003). For example, state court decisions applying the reasonable regulation test have invalidated blanket bans on the transportation of firearms. *See, e.g.*, *City of Junction City v. Mevis*, 601 P.2d 1145, 1152 (Kan. 1979); *City of Lakewood v. Pillow*, 501 P.2d 744, 745 (Colo. 1972); *City of Las Vegas v. Moberg*, 485 P.2d 737, 738 (N.M. Ct. App. 1971). But these restrictions would surely have been upheld if scrutized for only a conceivable rational basis. The majority's warning that reasonableness review would approve laws that "ma[k]e guns nearly impossible to obtain," Maj. op. 5651, is therefore unwarranted.[8]

For the Second Amendment's protection to be meaningful, judges need not inject their preferences into all arms policy decisions.

> [B]y employing a deferential standard the courts can oversee governmental regulation of the arms right and guard against extreme and excessive laws that effectively eliminate the core right to bear arms. . . . [C]ourts can serve as a check on the elected branches to insure that legislation does not eliminate the basic right. If gun control laws are excessive, the courts can . . . provide some relief for the affected individuals. Where a law is so broad as to make gun ownership—or at least gun purchasing and repair—illegal, the courts insure that the underlying right is more than illusory. The reasonable regulation standard enables the courts to act as a safety valve to counter governmental overreaching, but does not

---

[8]Similarly, the majority's citation to Supreme Court authority disclaiming rational basis review is misplaced here, as I do not propose rational basis review.

> seriously interfere with legislative authority to regulate firearms in the interests of public safety.

Winkler, *supra*, at 725. The line of precedent interpreting state constitutions, including "hundreds of cases involving challenges to a wide array of gun laws," is instructive. Allen Rostron, *Protecting Gun Rights and Improving Gun Control after* District of Columbia v. Heller, 13 Lewis & Clark L. Rev. 383, 407 (2009). Among state courts, "there is an overwhelming consensus that government restrictions on guns are valid if they are 'reasonable regulations.' " *Id.* (internal citation omitted). The standard applied by state courts, while deferential, is not toothless; state courts "have used it to strike down laws found to be arbitrary or to amount to a complete denial of the right to bear arms." *Id.* at 407-08 (internal quotation omitted). "States have far more experience than the federal government when it comes to charting the lines between gun rights and safety regulation, and the 'reasonableness' standard they have unanimously endorsed both reflects their collective wisdom on the subject and permits individual states to tailor gun regulations to their own circumstances." Joseph Blocher, *Reverse Incorporation of State Constitutional Law*, 84 So. Cal. L. Rev. 323, 383 (2011). Our doctrine should be a bulwark against impermissibly arbitrary and sweeping arms restrictions, indeed it should be "the palladium of the liberties of a republic," to borrow a phrase from Justice Story in his famed *Commentaries on the Constitution of the United States*,[9] but it should not constrain enactment of commonsense public safety policies.

---

[9]3 Joseph Story, *Commentaries on the Constitution of the United States* § 1890, at 746 (Boston, Hilliard, Gray & Col. 1833) ("The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers . . . .").

### III

I have written repeatedly of the vital interests served by a robust and vibrant Second Amendment. Central to the Amendment's core purpose is not just defense of the home, as emphasized by the Supreme Court in *Heller*, but also defense of country from both foreign intrusion and internal tyranny. Those who have learned, even imperfectly, the lessons of history, and who understand that human nature does not change as rapidly as technology, will recognize that these are not phantom threats but core values protected by the Second Amendment. Our government has been democratic and our borders secure, and so it is hard for modern minds to consider the need to take up arms for protection of country from threats both internal and external. But constitutions are designed to endure and the Bill of Rights must be interpreted in light of the long period of time over which we hope that our country will thrive. The Framers of the Second Amendment had in mind that an armed citizenry can both repel external aggression and check the danger of an internal government degenerating to tyranny.

As I have said previously, "I do not think that individual rights under the Second Amendment are outmoded . . . . The Second Amendment was designed to provide national security not only when our country is strong but also if it were to become weakened or otherwise subject to attack. As the people bear the risk of loss of their freedom and the pain of any attack, our Constitution provides that the people have a right to participate in defense of the Nation. The Second Amendment protects that fundamental right." *Nordyke v. King*, 364 F.3d 1025, 1037 (9th Cir. 2004) (Gould, J., dissenting from denial of rehearing en banc) (internal alterations and citation omitted).

Prudent, measured arms restrictions for public safety are not inconsistent with a strong and thriving Second Amendment. For that reason, I disagree with and do not join the por-

tion of the majority opinion that requires heightened scrutiny for arms regulations substantially burdening the right to bear arms, even though these may represent reasonable arms regulations.[10]

---

[10]I disagree with the majority's characterization of the law governing abortion. For example, the majority says that abortion's status as a fundamental right is disputed and cites for that proposition only a dissenting opinion from an unrelated case. Maj. op. at 5642-43 n.8. But if dissenting opinions called into question whether legal rules are settled, then all Supreme Court opinions not commanding unanimity would be "disputed." In any event, this appeal is not about abortion rights and the opinion of the court errs, I think seriously, when it inserts its views on abortion rights in a Second Amendment controversy.